Law Offices Of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON    #2948
1001 Bishop Street, Suite 1180
American Savings Bank Tower
Honolulu, Hawaii 96813
Telephone Number:   523-7041
Facsimile Number:  538-7579
E-Mail:  wharrison@hamlaw.net

Attorney for Defendant
WILLIAM WONG

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 21-00041DKW-01 |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| vs. | ) | **ADDRESSING THE 18 USSG** |
| | ) | **§3553  FACTORS AND** |
| WILLIAM WONG, | ) | **MOTION FOR VARIANCE;** |
| | ) | **MEDICAL ATTACHMENT;** |
| Defendant. | ) | **CERTIFICATE OF SERVICE** |
| _____ | ) | **[REDACTED]** |

## DEFENDANT'S   SENTENCING   MEMORANDUM   ADDRESSING THE 18 USSG §3553  FACTORS AND MOTION FOR VARIANCE

Comes now Defendant WILLIAM WONG, by and through his counsel, William A. Harrison, and hereby submits his sentencing memorandum and motion for variance.

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………… ii

I.     INTRODUCTION…………………………………………………..... 2

II.    18 USC § 3553 CONSIDERATIONS…………………………………... 2

   A.   Nature and Circumstances of William Wong's Offense and His
        History and Characteristics……………………………................. 3

      1.   Circumstances of the Offense-Background on DPP………….. 3

      2.   His History and Characteristics………………………………. 10

      3.   Need for Just Punishment considering the Seriousness of the
           Offense, 18 U.S.C. § 3553(a) (2) (A)…………………........... 10

         (a) Punishment……………….. …………….......................... 11

         (b) Deterrence……………….. ……………......................... 11

         (c) Respect for the Law……………….. ……………............. 13

         (d) Protection of the Public……………….. ……………….... 14

         (e) Need for Medical Care and Correctional Treatment in the
             Most Effective Manner ……………………………………. 14

      4.   The Kinds of Sentences Available ………………….............. 15

III.   OTHER IMPORTANT CONSIDERATIONS……………………….… 16

      (a) Recent Amendment Giving Credit to Zero Point Offenders…… 16

      (b) Age……………………………….......................................... 21

i

IV.   LEGAL FRAMEWORK FOR THE REQUEST …………………............   22

V.   CONCLUSION…………………………………………………….....   24

TABLE OF AUTHORITIES

Cases

Page(s)

Alison Liebling & Shadd Maruna eds., 2005…………………………………...   17

Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999)…………………………………………...   12

Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47………………………...   17

Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S50S-51S (2011)…………………   12

*Gall v. United States*, 552 U.S. 38, 49 (2007)………………………………….   17

Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998)…………………………………………………   16

*Kimbrough v United States*, 552 U.S. 85, 90 (2007)………………………...   18

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004)………………………………………………   12

*Nelson v. United States*, 555 U.S. 350, 352 (2009)………………………….   17

U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004)……………………………………………………………...   16, 17

*United States v. Hammons,* 558 F.3d 1100 (9th Cir. 2009)…………………   18

*United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007)…………………   16

## FEDERAL STATUTES

Page(s)

18 U.S.C. § 1343…………………………………………………..    15

18 USC § 3553…………………………………………………..    2

18 U.S.C. § 3553 (a)……………………………………………..    18, 19

18 U.S.C. § 3553(a) (2) (A)……………………………………..    10

18 U.S.C. § 3553(a) (3)…………………………………………    15, 18

18 U.S.C. § 3561(c) (1)…………………………………………    15

18 U.S.C. § 3563 (b)……………………………………………..    2

18 U.S.C. § 3563…………………………………………………    16

18 USC § 3553 (a) (2) (D)………………………………………...    14

## USSC GUIDELINES

Page(s)

USSG § 5C1.1(c) (3)…………………………………………...    2

USSG § 5C1.1……………………………………………………    15, 16

USSG § 5H1.1……………………………………………………    16

## I.   <u>INTRODUCTION</u>

The government has filed its Motion for Downward Departure and Sentencing Memorandum. In its filing the government seeks a 5K1.1 departure of five (5) offense levels from the advisory guidelines from a level 19 to a level 15 and recommends a 15-20 month term of imprisonment.

This memorandum is submitted to provide the court with appropriate facts to support Mr. Wong's recommendation of an additional 3 level variance to  Zone B of the sentencing table.   Mr. Wong would urge the court to sentence him to probation with a home confinement component pursuant to 18 U.S.C. § 3563 (b) (19) and USSG § 5C1.1(c) (3).   This recommendation, under the facts of this case is indeed sufficient, but not greater than necessary to accomplish the goals of sentencing.

## II.   <u>18 USC § 3553 CONSIDERATIONS</u>

William Wong stands before this court for sentencing  on the first criminal matter in his life. His family life, work history and community involvement stands in stark contrast to his involvement in the "pay to play" scheme for which he is now charged. Except for the present matter Mr. Wong has lived an exemplary life. All his support letters attest to this fact.

This court is now called upon to consider what manner of just sentence should be imposed upon Mr. Wong for his involvement in this

case.

### A.  Nature and Circumstances of William Wong's Offense and His History and Characteristics

### 1.  Circumstances of the Offense -Background on DPP

Mr. Wong was legally qualified and authorized by the City to essentially "cut the line." The reason he was able to get top priority on his projects was because he was authorized to in essence perform the job required of the City and County.

Mr. Wong was the first qualified Pre-Screener, an authorized Review Coordinator, and the first Third Party Residential Reviewer ("TPR"). He worked hard to be qualified and he paid an annual fee to the city to be a TPR. The Department of Planning and Permitting ("DPP") staff loved working with Mr. Wong because he alleviated the normal workload for DPP regarding his projects.

In 2013, DPP launched ePlans, a program designed to electronically review building permit plans. Since plans would be uploaded electronically online, DPP needed to make sure all files were uploaded according to specifications set by the city.

The DPP created a new step in the permit routing process called Pre-screening. This new ePlans building permit application step, required all plans to be submitted to DPP for quality prescreening prior to routing to

various departments for review and approval. Thereafter, to be reviewed by the City, to make sure that the plans met certain criteria before the permitting process could begin. That prescreening process with DPP took weeks – or even months – before plans were qualified to be reviewed and approved.

The City was completely backlogged after initiating this new phase in the permit routing process. To speed up the process for DPP as well as the general public, in October of 2014 Mr. Wong worked with Susan Vogt (ePlans Project Manager), Arthur Challacombe, and George Atta (the then DPP Director) to become the first to be authorized as a "qualified prescreening" business by the City & County of Honolulu for ePlans. Instead of people going back and forth and waiting on DPP to approve the plans for prescreening, pre-screeners like Mr. Wong worked directly with clients, made necessary corrections, and submitted the plans electronically to the City. As a City qualified ePlans pre-screener, Mr. Wong's plans were able to bypass the DPP's prescreening process and go directly into the plans review stage.

Through Mr. Wong's qualification with the City, he was able to electronically upload the plans directly to DPP for various department reviews and approvals, saving homeowners the time, money, and hassle

4

involved in the permitting process. Mr. Wong never charged his clients for expediting the prescreening process.

Typically, the DPP Plans Reviewer/Clerk is responsible to facilitate all coordination of the various reviewing agencies whenever a task is identified. This process may take 1-2 weeks. In February of 2016, George Atta authorized APAC to be the first privatized Review Coordinator (RC) for residential permits. RC allows APAC to electronically review ePlans and coordinate directly with the various review agencies. By bypassing the process with the DPP clerks, APAC was able to move the reviewing process along much quicker.

Around six years ago, DPP was under great scrutiny and criticism due to the extremely lengthy building permit process. The fallout from the delays was significant. People trying to sell their homes were forced to endure additional months of mortgage payments, while awaiting permits to be issued. New homeowners had to make mortgage payments on unconstructed homes because of delays in the permit process. Small businesses suffered; architects, drafters, engineers, and contractors were all put on hold due to the long wait periods.  Companies were forced to lay off employees due to the long wait for permits, which resulted in a loss of clientele. The City & County of Honolulu, which was understaffed and ill equipped to handle the

volume of permits, scrambled to come up with solutions to speed up the process. Mr. Wong stepped up and worked directly with George Atta (the then Director of DPP), Arthur Challacombe, and Timothy Hiu to help establish the Third Party Residential Reviewer partnership, in order to help expedite the permits.

To help the City, come up with an immediate solution to get permits approved faster,  Mr. Wong  worked with and helped DPP to establish the Third Party Residential Reviewer partnership.  The idea was to help alleviate the backlog at  DPP by establishing a system where private companies could review projects for building and zoning code compliance. Mr. Wong believed this would help DPP push out the building permits quicker, and at the same time, it would provide other small businesses with an opportunity to get involved. The city would also be able to avoid costs of hiring and training new employees.

Using his own funds,  in 2015, Mr. Wong flew to the mainland to take a test[1] to become a certified Third Party Residential Reviewer.

After Mr. Wong passed the mainland test, DPP created its own version of the test.   Mr. Wong took and passed that test as well. He became Hawaii's very first Third Party Residential Plans Reviewer, doing business

---

[1] Hawaii did not have a test available at this time.

6

as Asia Pacific Architectural Consultants (APAC).  He paid an annual fee to the City in order to maintain his Third Party Residential Reviewer status. APAC not only reviewed the projects for building and zoning code compliance, but they also coordinated with the other agencies through the DPP clerks.

In addition to helping to kick start the Third Party Residential Review in Honolulu,  Mr. Wong also volunteered to educate the public on the new programs the city was trying to implement in order to speed up the permit process, such as ePlans submittals (electronic plans, verses hard copy submittals). Mr. Wong gave numerous presentations to the American Institute of Architects Honolulu Chapter, local realtor groups, banks, mortgage companies, and many homeowners and contractors to help promote DPP's efforts in addressing the long wait times and tremendous backlog in the issuance of residential permits.  It was clear that both the public and the city had problems that needed to be addressed.  Mr. Wong stepped in to help everyone including homeowners, architects, contractors, realtors, mortgage companies, as well as the City & County of Honolulu. Mr. Wong also assisted a couple of individuals in starting their own certified Third Party Residential Review business.

Third Party Residential Reviewers are DPP certified licensed

engineers and/or architects who are qualified and authorized to review plans for building and zoning code compliance. They review plans, just as the city does; they make comments and work directly with building permit applicants until the plans meet all the required codes.

Once the plans are deemed code compliant by the Third Party Residential Reviewer and the other various agencies, they are sent to the Permit Issuance Branch at the DPP for final approval. Plans submitted through an authorized Third Party Residential Reviewer did not require further review from a city plans reviewer.

Instead, a quick check to make sure the proper forms have been completed and then a final sign off was all that was needed to issue a building permit. APAC's Third Party Residential Review services significantly cut down the wait time at the DPP for a permit; instead of taking 8 to 24 months to get a permit, Mr. Wong was able to obtain approved permits for his clients in as little as one month.

Third Party Residential Review became a win-win situation for everyone. Not only was the city able to save money by not having to hire additional staff, but they were also able to generate money by approving permits at a faster rate. Architects, drafters, engineers, and contractors were able to conduct business in a timely and efficient manner, and homeowners

were spared the agony of additional stressors and expenses.

However, the process was still broken. Despite Mr. Wong's efforts to help effect change in Honolulu, there came a time when his permits once again stalled. Theoretically, the Plans Reviewer at the DPP should be issuing permits upon receipt of the approved plans, but with just one person authorized to issue permits through ePlans,  Mr. Wong's clients faced obstacles all over again. After about a year of successfully conducting business as a certified Third Party Residential Reviewer, APAC's projects were no longer being expeditiously approved.

Time and again, Mr. Wong found himself still having to wait several months for final permit approval. Without that one person's signature, the process repeatedly stalled when the permits were not approved. APAC's clients, who had paid for a service they were not getting, became understandably frustrated. Mr. Wong was frustrated as well; he had worked hard with DPP over the span of several years to try to fix a system that was broken, and nothing seemed to work. Unfortunately, Mr. Wong felt he was stuck between a rock and a hard place; his obligation to his clients and the concern of being able to sustain his business ultimately led him to give in to the pressures and participate in the "pay to play" culture.

There is little dispute as to the factual circumstances surrounding Mr. Wong's involvement in the offense. He admitted his complicity to the FBI agents immediately upon being approached by them and has taken complete responsibility for his conduct in this case.

### 2.   His History and Characteristics

The numerous reference letters submitted to the court provide a complete picture of the man who stands before this court. He is an amazing family oriented man, who is loving, caring, generous and community minded, in every sense of the word. Importantly, he is a God fearing man.

Myrna Wong's letter sums all these attributes up very poignantly. The actions of the man in this matter, are clearly out of character – an aberration. His life stands in stark contrast to the charges he faces. That said, his history and characteristics clearly cry out for a unique sentencing approach in this case. An approach which would provide for all sentencing goals, coupled with compassion for who he is and all that he has done apart from his present situation.

### 3.   Need for Just Punishment considering the Seriousness of the Offense, 18 U.S.C. § 3553(a) (2) (A)

Mr. Wong acknowledges that this court must consider the  traditional goals of sentencing -  punishment, deterrence, respect for the law and protection of the public. We would submit however a sentence of probation

with a home confinement component adequately addresses all the above sentencing objectives and concerns.

**(a)    Punishment**

Culturally, the concept of "face" is extremely important to Mr. Wong. His case has garnered significant publicity, which has caused him substantial "loss of face." Thus, he has already been severely punished as a result of the public shame and humiliation surrounding his involvement in this case.

Additionally, he has suffered financially. His business has dwindled to the point that he has not been able to meet his financial obligations. He is being sued by creditors and will soon be filing bankruptcy to save what little remains of his business and personal finances.

More importantly, Mr. Wong's actions have placed enormous stress on his loved ones.  He is pained by the fact that he has placed Myrna, his wife of 49 years, in an extremely precarious place financially and emotionally. This collateral damage is the most significant element of punishment Mr. Wong is called upon to endure.

**(b)    Deterrence**

The empirical evidence is unanimous in the finding that there is  no relationship between l e n g t h  o f  imprisonment and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et*

*al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects").

Even the Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . .. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. *See also* Part IV.A.3, *infra*. And according to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

It is obvious from all considerations in this case that a sentence which includes home confinement is more than adequate to address the deterrence concern of the court.

**(c)    Respect for the Law**

As noted , Mr. Wong sought to make amends for his conduct by immediately cooperating with the investigation into suspected City corruption. The government supports this position when it argues:

> When approached by agents from the Federal Bureau of Investigation, defendant confessed that he had been paying bribes to expedite the approval of building permits. Defendant identified, among others, ███████████ who during their tenures at the Department of Planning and Permitting (DPP) had responsibility for the approval of building permits, and ███████████ who also worked at DPP. Defendant continued to meet with the FBI and the government, and he testified in the grand jury. With the cooperation of defendant, the government indicted two of the three DPP employees identified by defendant, and all three have entered guilty pleas. ███████also cooperated with the government and was charged by information.) The conviction of ███████ ████ ██ ███████ ████████████████████████████████████████████ Defendant's availability to serve as a witness at trial certainly helped induce the guilty pleas from ████████ █████████.

.

See Government's Motion for Downward Departure at pgs. 2-3.

Mr. Wong has taken full responsibility for his actions, accepts the fact that he will be punished, and cooperated with authorities, clearly exhibiting his respect for the lawful authority of the government.

**(c)    Protection of the Public**

There is no basis to believe that Mr. Wong will ever recidivate. There

is absolutely nothing in his background that would suggest that he has not learned from this experience or that he is a danger to the public. In fact, the many character reference support letters state otherwise.

Moreover, since April 7, 2021, Mr. Wong has been released on bond. He has complied with all conditions of his release. His recent compliance would suggest that he has clearly learned from this experience and that he is not a danger to the public. Quite the contrary all indications point to a contrite, remorseful individual who is unlikely ever to engage in unlawful conduct again. Those closest to him abundantly emphasize this notion in their letters to the court.

### (e)    Need for Medical Care and Correctional Treatment in the Most Effective Manner

18 USC § 3553 (a) (2) (D) requires the court to consider how to provide the defendant with needed medical care in the most effective manner. As the presentence report indicates, Mr. Wong suffers from several medical ailments the most debilitating   of which are ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ See PSR at ¶ 53. He also has █████████

█████████ which are significantly worsening. See Myrna Wong's letter to the Court.

Importantly, Mr. Wong's ████████████████████████████████ ████████████████████ ████████ See medical report of Dr. Sharon Lawler attached.

Mr. Wong would submit that the "most effective manner" to provide him with further needed medical care would be to allow him to obtain appropriate medical treatment from his present doctors while under home confinement. The sentencing guidelines recognizes the fact that a downward departure may be appropriate to accomplish a specific treatment purpose. See § 5C1.1, Application Note 7.

4.    **The Kinds of Sentences Available**

This Court is required to consider "the kinds of sentences available" by statute.  18 U.S.C. § 3553(a) (3).  Congress has provided for a range of sentences for this offense, from a term of probation of not less than one year and no more than  five years; to  up to 20 years' imprisonment.  *See* 18 U.S.C. § 1343 and 18 U.S.C. § 3561(c) (1).  There is no required minimum sentence, nor a prohibition against probation. Under the guidelines probation is not authorized. However, the guidelines are just that -  a guide. There are no mandatory provisions against probation thus the court has the discretion to authorize a probationary sentence.  Indeed, "[c]ongress thus not only envisioned, but accepted, the possibility that some defendants

15

found guilty . . . would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years with no mandatory minimum). Thus, even if the court decides that confinement is appropriate in this case, home confinement is a proper alternative to prison. 18 U.S.C. § 3563 and § 5C1.1.

## III.   OTHER IMPORTANT CONSIDERATIONS

### (a)   Recent Amendment Giving Credit to Zero Point Offenders

The United States Sentencing Commission ("USSC") voted to adopt 11 new amendments to its guidelines. The vote on the amendments were unanimous except for the adopted amendment to § 1B1.13 (reduction of sentence) which vote was split 4-3.

One of the amendments which was adopted unanimously was a new guideline at §4C1.1 which provides a -2 point reduction for "certain zero-point offenders." The new amendment to its guidelines reads as follows:

PART C — ADJUSTMENT FOR CERTAIN ZERO-POINT OFFENDERS §4C1.1. Adjustment for Certain Zero-Point Offenders (a) ADJUSTMENT.—If the defendant meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did

16

not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; decrease the offense level determined under Chapters Two and Three by 2 levels.

See: https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023

When Congress enacted the Sentencing Reform Act ("SRA") in 1984, it believed there was "too much reliance on terms of imprisonment when other types of sentences would serve the purposes of sentencing equally well without the degree of restriction on liberty that results from imprisonment."[2] Through the SRA, Congress sought to "assure the availability of a full range of sentencing options from which to select the most appropriate sentence in

---

[2] S. Rep. No. 98-225, at 59 (1983) as reprinted in 1984 U.S.C.C.A.N. 3182, 3242. See also id. at 50 (finding that the law "is not particularly flexible in providing the sentencing judge with a range of options," such that "a term of imprisonment may be imposed in some cases in which it would not be imposed if better alternatives were available" or "a longer term than would ordinarily be appropriate simply because there were no available alternatives that served the purposes he sought to achieve with a long sentence.").

17

a particular case,"[3] including probation with meaningful conditions, and alternatives to all or part of a prison term such as fines, community service, and intermittent confinement.[4]

In enacting the SRA, Congress tasked judges and the Commission with assuring that the full range of sentencing options, not merely incarceration, were available. Judges were instructed to consider "the kinds of sentences available" prior to imposing a sentence sufficient but not greater than necessary to serve the purposes of sentencing.[5] And the Commission was instructed to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."[6]

Unfortunately, the use of probation and other alternatives to prison dramatically decreased after the SRA. When the SRA was enacted "almost 50 [percent] of federal sentences were sentenced to straight probation."[7] Under the initial guidelines, approximately 15 percent of sentences were to

---

[3] *Id*. at 39.
[4] *See id.* at 50, 59.
[5] 18 U.S.C. § 3553(a)(3).
[6] 28 U.S.C. § 994(j).
[7] Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers* 56 Stan. L. Rev. 1211, 1222 (2004).

straight probation.[8] Last year, straight probation was imposed in only 6.2 percent of cases.[9] And no matter the sentencing zone, alternative sentences other than probation are exceedingly rare.[10]

Moreover, the commission recognized that persons with zero criminal history points have a significantly lower rate of recidivism that other groups, thereby posing little risk to public safety.[11]

In the face of these statistics the USSC has chosen to adopted §4C1., in an attempt to address these concerns.

Unless Congress enacts law to modify or disapprove any repeal and/or amendment, the adoption of the new §4C1.1 (e) will go into effect

---

[8] *See id.* at 1222.

[9] See USSC, 2021 *Sourcebook of Federal Sentencing Statistics* fig. 6 & tbl. 14 (2022), https://bit.ly/3TL44UL ("FY 2021 Sourcebook") (excluding non-U.S. citizens, probation only sentences were imposed 8.1 percent of the time); *see also* Cecelia Kingele, *What's Missing? The Absence of Probation in Federal Sentencing Reform* 34 Fed. Sent'g Rep. 322, 324 (2022) (recognizing that while for some offenses, probation is prohibited by statute, judges are still imposing imprisonment in many cases where probation is available).

[10] See FY 2021 Sourcebook, at tbl. 14; *see also* USSC, *Public Data Presentation for Proposed Criminal History Amendment*, slide 58 (2023), https://tinyurl.com/2p9989vf ("CH Data Briefing") (reporting that people sentenced last year who would have been eligible for the proposed §5C1.1 application note 4 departure received prison-only sentences 79.3 percent of the time).

[11] See, e.g., USSC, *Recidivism of Federal Offenders Released in 2010* 6 (2021), https://tinyurl.com/2p922sns; see also USSC, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 2 (2017), https://tinyurl.com/5n8hn77f

**November 1, 2023**.

Since its inception, the Sentencing Commission has amended the Guidelines Manual more than 800 times. Dave S. Sidhu, Congressional Research Service, *Congressional Review of Proposed Amendments to the U.S. Sentencing Guidelines*, at 1, June 6, 2023, available at https://bit.ly/3pFl1WA (last visited July 10, 2023). Congress has rejected proposed amendments to the Guidelines just once. *Id.* That happened in 1995, when Congress passed a law blocking two proposed amendments to the crack cocaine and money laundering guidelines. *Id.* at 2. "This single act, disapproving of two proposed amendments represents the first and only time the proposed amendments to the Guidelines have been formally rejected by Congress. The disapproval is thus the sole precedent for the possible rejection of future proposed amendments to the Guidelines." *Id.*

Mr. Wong falls within this category of "zero point offenders" as he has no prior criminal history. He is the exact type of individual the USSC sought to include as a recipient of such credit.

Unfortunately, the amendment will not go into effect until November 1, 2023. In anticipation of § 4C1.1 becoming effective on November 1, 2023, the court can either continue this case for sentencing until after that date, or authorize a variance of -2 points at the present sentencing hearing.

20

If the court agrees with the requested variance, Mr. Wong's offense level would then be a 17, with a corollary guideline of 24-30 months. Further if the court were to agree with the government's requested departure of 5 levels, Mr. Wong's guideline range would be 10-16 months, placing him in Zone C of the Guideline Sentencing Table.

**(b)   Age**

Since the inception of the guidelines, the Commission has acknowledged that home confinement is a "form of punishment" that may be "equally efficient" as incarceration for an elderly and infirm defendant. USSG § 5H1.1.  Indeed, the same prison sentence for an older offender amount to harsher punishment than that for a young or middle-aged offender.  *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998).  See also, U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf.

Offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems,"

and they are "easy prey" for more experienced inmates. *Id*. at 10. For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005).

Mr. Wong is 74 years old. He has never been in a prison environment. He is presently undergoing medical treatment for numerous ailments and illnesses. He represents the classic model of the type of individual Crawley & Sparks speaks about in their research! Accordingly, we would ask that the court consider these additional age and infirmity factors in fashioning a sentence in this case as well.

## IV.   LEGAL FRAMEWORK FOR THE REQUEST

While this Court must correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007). In determining an appropriate sentence, this Court must

of course consider the sentences available by statute. *See* 18 U.S.C. § 3553(a) (3). Therefore, this court is not bound to follow the applicable guidelines but may authorize a variance from the guidelines where warranted. See *United States v. Hammons,* 558 F.3d 1100 (9th Cir. 2009) (district court must consider, but is not bound by, the applicable guideline sentencing range).

In this regard, there is no presumption of reasonableness attached to the guideline range nor a presumption of unreasonableness of a non-guideline range sentence.

After considering the guideline range and § 3553(a) factors in relation to the events of this case, the court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). Consideration of these factors emphatically underscore the position that a sentence of 15-33 months of incarceration is far "greater than necessary" to implement the purposes of § 3553(a), and thus a variance is clearly warranted.

For the following reasons, Mr. Wong respectfully requests that the Court grant a downward variance because of the unique circumstances of this case and the fact that Mr. Wong is clearly the type of offender for whom the government's suggested punishment range is unjustified.

23

## V.    CONCLUSION

Thus, the facts and circumstances in this case justifies a variance in sentence to allow for home confinement and a fine of no more than $10,000.00. Such a sentence would meet the requirements of 18 U.S.C. § 3553 and importantly provide for the unique considerations of this case.

For the reasons stated, William Wong would respectfully request that this Court grant such a variance and impose the requested sentence.

DATED: at Honolulu, Hawaii, July 20, 2023.


Law Offices of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON
Attorney for Defendant
WILLIAM WONG

24

# ATTACHMENT

**SHARON S. LAWLER, M.D.**

1029 Kapahulu Avenue, Suite 300
Honolulu, Hawaii 96816
(808) 729-9090
Physician's Exchange (808) 524-2575
Fax (808) 733-5122

July 5, 2023

Re:  William W. Wong

███████████████

To Whom It May Concern,

Mr. Wong is under my care for multiple medical problems. ████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

   In addition, he will need nerve testing (EMG) and an MRI of the lower spine. ███████

████████████████████████████████████████████████

██████████████████████████████████████████████████

I am requesting that Mr. Wong be granted time to have these tests and evaluations done on an emergent basis to prevent further damage to his ██████████████

If there are any further questions, please feel free to contact me.

Sincerely,

Sharon S. Lawler, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 21-00041DKW-01 |
| | ) | |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
| vs. | ) | |
| | ) | |
| WILLIAM WONG, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing will be duly served after filing, by email (ECF) or by mail, postage prepaid, on the following parties at their last known addresses:

**CRAIG NOLAN**, **ESQ.**
**MICHAEL NAMMAR, ESQ.**
Assistant U.S. Attorney
300 Ala Moana Boulevard, Ste. 6-100
Honolulu, Hawaii 96850

**DEREK KIM**
Senior U.S. Probation Officers
United States Probation Office
300 Ala Moana Boulevard
Honolulu, Hawaii 96850

DATED: at Honolulu, Hawaii, July 20, 2023.

Law Offices of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON
Attorney for Defendant
WILLIAM WONG

25